**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ MAR 3 0 2012 ★

**BROOKLYN OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
KENNETH FOX, on behalf of himself
and others similarly situated,

                      Plaintiffs,

      -against-

COMMONWEALTH WORLDWIDE
CHAUFFEURED TRANSPORTATION
OF NY, LLC, and D&S AUTO LEASING, LLC,

                  Defendants.

-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**08-CV-1686 (NGG) (RML)**

NICHOLAS G. GARAUFIS, United States District Judge.

     Plaintiff Kenneth Fox filed this putative class action against his former employer,

Commonwealth Worldwide Chauffeured Transportation of NY, LLC ("Commonwealth"), in

2008.[1] Fox worked as a chauffeur for Commonwealth, and alleges that while he was there

Commonwealth failed to pay him and other chauffeurs the full amount of overtime they were

entitled to receive under federal and state employment law. Fox also raises solely individual

claims related to his separation from Commonwealth in March 2008.

     In January 2011, Fox moved to certify a "collective action" under § 16(b) of the Fair

---

[1] In a subsequent amended complaint Fox added D&S Auto Leasing, LLC ("D&S") as a
defendant. (See Docket Entry # 44.) Although technically incorporated as a separate entities, for the
purposes of this action D&S and Commonwealth are one and the same. Commonwealth operates the
business—apparently including hiring and firing employees—while its affiliate, D&S, owns the much of
its vehicle fleet and signs the chauffeurs' paychecks. (Defs.' Local Rule 56.1 Statement of Facts ¶¶ 4, 12
(Docket Entry # 73); Fox Dep. (Docket Entry # 75, Ex. 3) at 55-56.) Whatever the tax, insurance, or
liability limiting benefits this arrangement may hold for the companies' principals, both D&S and
Commonwealth are named defendants in this action and the court will refer to them in the singular as
"Commonwealth."

Labor Standards Act ("FLSA"), 29 U.S.C.A. § 216(b) (West 1998). While that motion was pending, Commonwealth moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on all of Fox's claims, arguing, inter alia, that Fox is covered by the "motor carrier exemption" to the statutory provisions underlying his overtime claims. For the following reasons, the court GRANTS Commonwealth's motion for summary judgment and—necessarily—DENIES Fox's motion for certification.

## I.   BACKGROUND

The following facts are not in dispute.

Commonwealth is a New York City area car service.[2] (Defs.' Local Rule 56.1 Statement of Facts ("Statement of Facts") (Docket Entry # 73) ¶¶ 1, 2.) It provides "luxury" chauffeured transportation to and from locations inside and outside of the City. (Id.) Commonwealth sometimes takes passengers to destinations outside of the State of New York. (Id. ¶ 2) With the possible exception of its New York to Boston service, see supra note 2, Commonwealth operates without fixed routes. (Statement of Facts ¶ 2.) Instead, Commonwealth's customers reserve vehicles in advance—although sometimes immediately in advance—and tell Commonwealth where they want to go. (Id.; 1st Rutter Aff. (Docket Entry # 75, Ex. 15) ¶ 12.) Some customers contact Commonwealth through stands that it maintains at certain New York City hotels and La Guardia airport, but most make reservations over the telephone. (Statement of Facts ¶ 3; 1st Rutter Aff. ¶ 12.) Commonwealth does not allow its drivers to "cruise" for customers. (1st

---

[2] According to its website, Commonwealth—although separately incorporated—is the New York branch of a Boston-based car service that shares its name. Commonwealth Worldwide Chauffeured Transportation, available at http://www.commonwealthlimo.com (last visited Nov. 28, 2011). Among the services offered by these companies is transportation between New York City and Boston. Id.

Rutter Aff. ¶ 12; Fox Aff. (Docket Entry # 80) ¶ 6.)

Commonwealth's fleet is high-end. A "Fleet Census" from 2008 shows that the majority of Commonwealth's vehicles are late-model Lincoln Town Cars. (1st Rutter Aff., Ex. 2.) The company also owns a number of brand new Cadillac DTS, several full size Mercedes, a Bentley, and a Rolls Royce. (Id.) Importantly for the purposes of this case, Commonwealth counts among its fleet over 40 SUVs and vans.[3] (Id.) The vast majority of the SUVs are Chevrolet Suburbans (id.), each of which has a seating capacity of nine people. (1st Rutter Aff., Ex. 6.) The vans are either Ford E250s or E350s, both of which can safely carry eight or more people. (Id.)

Commonwealth has a United States Department of Transportation ("USDOT") Number and a Federal Motor Carrier Safety Administration ("FMCSA") Certificate. (1st Rutter Aff., Ex. 3.) The FMCSA is a separate administration within USDOT. According to the FMCSA's website, the agency's main purpose "is to prevent commercial motor vehicle-related fatalities and injuries." FMCSA, available at http://www.fmcsa.dot.gov (last visited Nov. 29, 2011). Although—as discussed infra—the term of art,"commercial motor vehicle," applies to a variety of cars, vans, buses, and trucks, the website indicates that FMCSA is primarily focused on regulating large trucks and buses. Id. As part of this effort, the agency sets and enforces safety standards for commercial motor vehicles, their drivers, and the companies that operate them. Id.

---

[3] Dawson Rutter, President of Commonwealth, states in a 2008 affidavit that "approximately 39% of the vehicles or in our fleet are rated as suitable for transporting more than eight passengers, including the driver." (1st Rutter Aff. ¶ 4.) The court's own analysis of the 2008 Fleet Census arrives at a result closer to 36 percent. In either case, it appears that during the time Fox drove for Commonwealth, somewhere between a third and two-fifths of the fleet were larger vehicles capable of carrying eight or more people.

Acquiring a USDOT number is one of the first steps a company takes when it submits to regulation by the FMCSA, id., and a FMCSA Certificate appears to be a document verifying that a company has registered with the agency and that it carries the requisite amount of insurance (see 1st Rutter Aff., Ex. 3).

Commonwealth bills its customers in one of two ways: it either charges a flat fee, which is based on the mileage and expected duration of the trip; or it charges by the hour. (1st Rutter Aff. ¶ 15.) Commonwealth also asks customers to pay an additional amount in the form of a "service charge" for the drivers.[4] (2nd Rutter Aff. (Docket # 86, Ex. 16) ¶ 11; Fox Aff. ¶ 11.) Usually amounting to around 15 or 20 percent of the rest of the bill, the service charge is paid to Commonwealth, (2nd Rutter Aff. ¶ 9), which then fully remits it to the driver in his next paycheck. (Id. ¶ 11.)

Drivers are also paid an hourly rate. (Id. ¶ 8.) For any additional hour a driver works over 40 hours, he receives time-and-a-half. (Id. ¶ 13; Fox Aff. ¶¶ 11, 12.) The service charge remitted to drivers, however, is not factored into the drivers' overtime rates. (Id. ¶ 12; Fox Aff. ¶ 12.) In the language of the FLSA, it is not considered part of their "regular rate." See generally 29 U.S.C.A. § 207 (West 1998). The drivers still receive the service charge, but it is the same

---

[4] Commonwealth maintains that this charge is actually a "tip," which customers may and sometimes do decline to pay. Its president asserts that around June 2008 the company changed the wording of its invoices to clarify that customers are not obligated to pay extra on the driver's behalf. (2nd Rutter Aff. ¶ 11.) According to Rutter, Commonwealth replaced the term "service charge" with "recommended tip." (Id.) But Commonwealth's self-designations have little bearing on whether the charge is, for the purposes of the FLSA, a "tip"; and, even if they did, there is no question that during the relevant time period Commonwealth's invoices included an item labeled "service charge," and did not mention the word "tip." (Id.; Fox Aff. ¶ 11.) For these reasons, the court refers to the amount Commonwealth billed to customers on behalf of its drivers as a "service charge."

regardless of whether the driver is working his first or his forty-first hour of the week.[5]

Commonwealth hired Fox as a chauffeur in November 2007. (1st Rutter Aff. ¶ 3; Fox Aff. ¶ 1.) While he worked at Commonwealth, Fox was paid $7.50 an hour (2nd Rutter Aff. ¶ 13; Fox Aff. ¶ 11) to drive five passenger sedans, vans and SUVs, (Fox Aff. ¶ 10). His hourly rate increased to $11.25 when he worked overtime. (2nd Rutter Aff. ¶ 13; Fox Aff. ¶ 12.) Commonwealth's records show that Fox drove sedans for the majority of the 154 trips he made while employed (1st Rutter Aff., Ex. 6; see also Fox Aff. ¶ 10), but that he drove an SUV or a van on approximately twenty-three of his trips[6] (1st Rutter Aff., Ex. 6). On some of his trips Fox would cross state lines. (Statement of Facts ¶ 16.)

When Fox started work, he authorized Commonwealth to conduct a background check through a private consumer reporting agency, First Advantage. (Id. ¶ 17; Fox Dep., Ex. 11 (Docket Entry # 75, Ex. 5).) The day after Fox signed the authorization form, First Advantage ran his background check. (See Fox Dep., Ex. 12 (Docket Entry # 82, Ex. 6).) The background check revealed that in 1999 Fox pled guilty in New York state court to two misdemeanors: Criminal Solicitation in the Fourth Degree and Conspiracy in the Fifth Degree.[7] (Id.) It also

_____

[5] For example, at the beginning of the work week, a driver at Fox's pay grade (see infra) would receive $22.50 ($7.50 x 3) plus the service charge for a three hour trip, and $33.75 ($11.25 x 3) plus the same service charge for the same trip at the end of the week if he had already worked 40 hours.

[6] One time Fox drove a limousine. (1st Rutter Aff., Ex. 6.) The record does not indicate how many passengers the limousine could transport.

[7] In New York:

a person is guilty of conspiracy in the fifth degree when, with intent that conduct constituting:
    (1) a felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct; or
    (2) a crime be performed, he, being over eighteen years of age, agrees with one

showed that for each crime Fox was sentenced principally to sixty days imprisonment. (Id.) Fox does not dispute the accuracy of the background check.

Commonwealth did not look at Fox's background check immediately, but noticed it in early March 2008 when conducting—what appears to have been—a routine audit. (2nd Rutter Aff. ¶ 15.) On March 6, an official at Commonwealth told Fox that he was being taken off the road because of the background check. (Statement of Facts ¶ 23.) He instructed Fox to contact Commonwealth's human resources department to further discuss the matter. (Id.)

Four days later Fox sent a letter to Commonwealth's human resources department in Boston, in which he asserted that his employment had been "terminated." (Id. ¶ 26.) Through his letter, Fox requested that Commonwealth provide its reasons for allegedly firing him and also

---

or more persons under sixteen years of age to engage in or cause the performance of such conduct."

N.Y. Penal Law § 105.5 (McKinney's 2009).

> A person is guilty of criminal solicitation in the fourth degree when:
>    (1) with intent that another person engage in conduct constituting a felony, he solicits, requests, commands, importunes or otherwise attempts to cause such other person to engage in such conduct; or
>    (2) being over eighteen years of age with intent that another person under sixteen years of age engage in conduct that would constitute a crime, he solicits, requests, commands, importunes or otherwise attempts to cause such other person to engage in such conduct.

Id. § 100.5.

The background check did not contain—and Fox quit before Commonwealth could inquire about—the details surrounding the convictions. Through discovery, however, it was revealed that charges related to a family dispute arising originally from Fox's service as executor of his mother's estate. In apparent contravention of a Surrogate Court order, Fox transferred some of the estate's assets out of the country and refused to repatriate them. (Statement of Facts ¶ 34.) Held in contempt of court, Fox served over two years in jail, and, while incarcerated, discussed with an uncover police officer the possibility of hiring a hit man to beat or kill his brother. (Id. ¶ 35; see also Fox Dep., Exs. 32-35 (Docket Entry # 84, Ex. 12).) The two misdemeanors identified in the background check stemmed from these discussions. (Fox Dep. at 36.)

a copy of the background report. (Id.) He referenced New York's Correction Law, which limits employers' ability to fire employees on the basis of prior criminal convictions. (Id.; Fox Dep., Ex. 13 (Docket Entry # 77, Ex. 7).) A member of Commonwealth's human resources department soon replied. (Statement of Facts ¶¶ 27, 28.) She wrote to Fox that Commonwealth had decided to "pull you off the road" because "our first priority is to protect our clients." (Id. ¶ 28; Fox Dep., Ex. 14 (Docket Entry # 83, Ex. 8).) Among other items included with the letter were a copy of the background check and a form summarizing his rights under the Fair Credit Reporting Act. (Statement of Facts ¶ 27.) A short time later, Fox's counsel wrote to Commonwealth essentially reiterating the contents of Fox's letter. (Id. ¶ 29.) Counsel also asserted that Fox was terminated, but noted that Fox had not been given written notice of termination as required by New York's Labor Law. (Ex. 13 to Fox Dep.) He also directed Commonwealth's attention to the Correction Law. (Id.) Commonwealth responded with the same packet of information that it had originally sent to Fox. (Statement of Facts ¶ 30.)

About a month later, Fox filed suit. He alleged that Commonwealth violated the FLSA and New York's parallel statute, the Labor Law, by omitting to include the service charge in its calculation of his and other drivers' overtime rates. (Compl. (Docket Entry # 1) ¶¶ 31, 49, 59.) Fox also asserted that Commonwealth had fired him, and alleged that this action was an unlawful discriminatory practice for the purposes of New York's Human Rights Law ("NYHRL"). (Compl. ¶ 68.) Following several amendments to the complaint, (see 1st Am. Compl. (Docket Entry # 5); 2d Am. Compl. (Docket Entry # 44)), Fox added a claim under the Fair Credit Reporting Act ("FCRA"). (See 2d Am. Compl. ¶ 78).

On January 23, 2011, Fox moved for conditional certification a collective action under

§ 16(b) of the FLSA, a ruling that would allow Fox to also assert the overtime claims of similarly situated employees of Commonwealth. The court has deferred ruling on the Fox's motion until now so as to allow Commonwealth to file its potentially dipsositive motion for summary judgment. That motion was filed fully briefed on September 23, 2011.

## II.    DISCUSSION

### Motion for Summary Judgment

Commonwealth argues that there is no genuine dispute about the facts material to its defenses to Fox's overtime claims.[8] Likewise, it contends that the facts material to Fox's NYHRL and FCRA claims are not genuinely disputed. Commonwealth argues that, based on these established facts, it is entitled to judgment as a matter of law on its defenses and Fox's claims. Specifically, Commonwealth argues that the undisputed facts of the case show that, during his time at Commonwealth, Fox fell within two exemptions from the FLSA and Labor Law provisions that underlie Fox's overtime claims. It further contends that Fox has failed to produce evidence probative of a necessary element to his FCRA claim, and that his NYHRL claim is similarly without factual support.

"The court shall grant summary judgment [on a particular claim or defense] if the movant shows that there is no genuine dispute as to any material fact [regarding that claim or defense] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the resolution of a claim or defense under controlling law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute—or issue—about a fact is genuine if

---

[8] Commonwealth also argues in the alternative that, if it were not entitled to summary judgment on its affirmative defenses, it would still be entitled to summary judgment on Fox's underlying FLSA and Labor Law overtime claims.

there is evidence that would allow a reasonable jury to resolve the dispute in favor of the nonmoving party. See id. Where the burden of persuasion on a given claim or defense lies with the nonmoving party, the movant can meet the Rule 56(a) standard by simply pointing out the nonmoving party's failure to produce enough evidence to put the existence of a material fact into dispute. See Celotex v. Catrett, 477 U.S. 317, 322 (1986). Where the burden of persuasion on a claim or defense lies with the moving party, the movant must produce enough evidence to establish, beyond genuine dispute, all of the facts needed to prove that claim or defense.

The court first addresses Commonwealth's defenses to Fox's FLSA and New York Labor Law claims for allegedly unpaid overtime wages. Commonwealth argues that it is not liable to Fox for any unpaid overtime because Fox was covered by the FLSA's "motor carrier exemption" and "taxicab exemption." These are affirmative defenses, the elements of which Commonwealth would have to prove at trial. See Bilyou v. Dutchess Beer Distribs., 300 F.3d 217, 222 (2d Cir. 2002).

The motor carrier exemption is one of several exceptions to the overtime protections found in section 7 of the FLSA, 29 U.S.C.A. § 207 (West 1998). It applies to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." Id. § 213(b)(1). The purpose of the motor carrier exemption is to avoid subjecting employers to overlapping regulatory regimes. See Levinson v. Spector Motor Serv., 330 U.S. 649, 661 (1947). If the Secretary of Transportation is authorized under the Motor Carrier Act to set maximum work hours for an employee, then the FLSA's overtime provisions do not apply to that employee.

Importantly, it is the existence of the power to set to set maximum hours, not its actual

exercise, that triggers the motor carrier exemption. See id.; Morris v. McComb, 332 U.S. 422, 434 (1947); Bilyou, 300 F.3d at 299. Thus, the fact that the Secretary of Transportation has not yet, and possibly never will, set maximum service hours for Commonwealth's chauffeurs is irrelevant for the purposes of the exemption; what matters is whether the Secretary could prescribe such requirements.

Determining whether a particular employee is subject to the Secretary of Transportation's authority to set maximum work hours can be complicated. Section 31502(b) of Title 49 allows the Secretary to establish maximum work hours for "employees of . . . a motor carrier." But reference to this section alone is not sufficient.

To begin with, the Secretary of Transportation's power to prescribe maximum service hours under this section is limited, in relevant part, to employees of motor carriers involved in transportation of passengers or property between a place in a state and another state. See 49 U.S.C.A. § 31502(a)(1) (West 2007) (incorporating by reference the Secretary's general jurisdictional limits set out in 49 U.S.C. § 13501).

Next, "motor carrier" is a term of art. Today it means "a person providing motor vehicle transportation for compensation." See id § 31501 (stating that, for the purposes of § 31502, "motor carrier" has the same meaning as that provided in 49 U.S.C. § 13102); 49 U.S.C.A. § 13102(14) (West Supp. 2011) (reflecting amendments made by § 305(c) of the SAFETEA-LU Technical Corrections Act of 2008). But in 2007 and early 2008, when Fox drove for Commonwealth, motor carrier meant "a person providing commercial motor vehicle

10

transportation for compensation."[9] See 49 U.S.C.A. § 13102(14) (West 2007) (emphasis added).

"Commercial motor vehicle" is itself a term of art, defined to mean:

> a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle—
>
> A.    has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater;
>
> B.    is designed to or used to transport more than 8 passengers (including the driver) for compensation;
>
> C.    is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or
>
> D.    is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103.

Id. § 31132(1) (emphasis added). Thus, at the time Fox drove for Commonwealth, the Secretary

of Transportation had the power to set the maximum service hours of employees of persons who

provided transportation for compensation, if the vehicles they used: (1) traveled on the highways

in interstate commerce; and (2) weighed over 10,001 pounds, were designed to transport more

than 8 passengers including the driver, or carried hazardous material.[10]

---

[9] In June 2008, after Fox left Commonwealth, Congress removed the word "commercial" from the definition of "motor carrier" provided in 49 U.S.C. § 13102. See SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 11-244 § 305(c), 122 Stat. 1572 (2008). But the SAFETEA-LU Technical Corrections Act have not been given retroactive effect, see Benoit v. Tri-Wire Engineering Solutions, Inc., 612 F. Supp. 2d 84, 89-90 (D. Mass. 2009); Vidinliev v. Carey Int'l, Inc., 581 F. Supp. 2d 1281, 1291 (N.D. Ga. 2008), and so the court will apply the motor carrier exception as it existed during the time of Fox's employment.

[10] The court notes that, when Fox drove for Commonwealth, the Secretary of Transportation's relevant jurisdiction was somewhat redundantly defined. The Secretary's power to set maximum hours was limited to motor carriers engaged in interstate commerce, see 49 U.S.C.A. § 31502(a) (West 2007) (incorporating by reference jurisdictional limits set out in 49 U.S.C. § 13501), but a person could qualify as a "motor carrier" only if his vehicles was used in interstate commerce, see id. § 31501 (incorporating by reference definition of motor carrier found in 49 U.S.C. § 13102(14), which incorporated by reference definition of commercial motor vehicle found in 49 U.S.C. § 31132(1)). Thus, technically, the Secretary had jurisdiction over entities providing transportation in interstate commerce with vehicles used to

Finally, the term "employee" has a specialized meaning in the context of § 31502.

Although not statutorily defined,[11] cf. id. § 31501 (defining terms for Chapter 315 of Title

49), the term was long ago construed by the Supreme Court as referring only to those workers

"whose activities affect the safety of operation" of vehicles used in interstate transportation, see

Dauphin v. Chestnut Ridge Transp., Inc., 544 F. Supp. 2d 266, 273 (S.D.N.Y. 2008) (citing

Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695, 698 (1947); United States v. Am. Trucking

Ass'ns, Inc., 310 U.S. 534, 553 (1940)); see also 29 C.F.R. § 782.2 (Department of Labor rule

interpreting the Secretary of Transportation's power as limited to motor-carrier workers who

"engage in activities of a character directly affecting the safety of operation of motor vehicles in

the transportation on public highways of passengers or property in interstate or foreign commerce

---

provide transportation in interstate commerce. The 2008 amendment to 49 U.S.C. § 13102(14) (see
supra note 9) corrects this inelegancy.

[11] A definition for the term "employee" does appear elsewhere in Title 49. For the purposes of
Subchapter III of Chapter 311, an "employee" is:

> an operator of a commercial motor vehicle (including an independent contractor when
> operating a commercial motor vehicle), a mechanic, a freight handler, or an individual
> not an employer, who—
>
> A.    directly affects commercial motor vehicle safety in the course of
>        employment; and
> B.    is not an employee of the United States Government, a State, or a
>        political subdivision of a State acting in the course of employment by the
>        Government, a State, or a political subdivision of a State.

49 U.S.C.A. § 31132 (West 2007). Applying the maxim of expressio unius exclusio alterius, however,
the court concludes that this definition is limited to Chapter 311 and therefore non-binding as to § 31502,
which is in a different chapter, Chapter 315, of Title 49. Cf. TVA v. Hill, 437 U.S. 153, 188 (1978)
(interpreting the inclusion of one hardship among a list of statutory exceptions to mean the exclusion of
another un-listed hardship from the list). It notes, however, that, because the Chapter 311 definition is
almost identical to the judicial construction the term "employee" as used § 31502, reliance on the
Chapter 311 definition would yield the same outcome as to Fox.

within the meaning of the Motor Carrier Act").[12]

There are four broad categories of workers whose duties are said to directly affect the safety of vehicle operation: drivers, mechanics, loaders, and helpers of the first three. See Levinson, 330 U.S. at 673. The Secretary of Transportation, with his or her specialized knowledge, is charged with designating which classes of workers directly affect safety, but it is for the courts to determine whether a particular worker falls within such a classification. Cf. Pyramid Motor Freight Corp., 330 U.S. at 707 (recognizing the power of the Interstate Commerce Commission, which was formally empowered under what is today § 315102, to establish safety-affecting classes of workers). A worker need not spend all of his or her time on activities related to one of these categories, but such duties must actually affect the safety of operating vehicles in a non-trivial way. See id. at 707-08. What matters is the degree to which a worker's activities affects safety, not the amount of time the worker spends on that activity. See Levinson, 330 U.S. at 674-75.

The same is true with respect to a worker's involvement in interstate transportation. As long as interstate transportation "constitutes a 'natural, integral, and inseparable part'" of a worker's activities, the interstate transportation requirement is met. Dauphin, 544 F. Supp. 2d at 274 (quoting Morris, 332 U.S. at 433). In the case of a driver, interstate transportation is a

---

[12] Of course, because the motor carrier exception tracks the Secretary of Transportation's regulatory authority, it would be the USDOT's rules— not the those of the Department of Labor—that could potentially bind the court's construction of the exemption. See Levinson v. Spector Motor Serv., 330 U.S. 649, 676-77 (1947). Nevertheless the Department of Labor's interpretation "is entitled to respect to the extent that it has the 'power to persuade.'" Dauphin v. Chestnut Ridge Transp., Inc., 544 F. Supp. 2d 266, 273 n. 2 (S.D.N.Y. 2008) (quoting Christensen v. Harris County, 529 U.S. 576, 587 (2000)); see also Baez v. Wells Fargo Armored Serv. Corp., 938 F.2d 180, 181-82 (11th Cir. 1991) (adopting the standard set out in 29 C.F.R. § 782.2 as the law of the Eleventh Circuit).

13

"natural, integral, and inseparable" part a worker's duties if the worker "is likely to be called on to perform interstate travel," irrespective of how many hours the worker actually devotes to affecting the safety of vehicles engaged in interstate transportation. Id. (citing Morris, 332 U.S. at 433). Thus, at least one court has held that the interstate transportation requirement was met with respect to certain limousine drivers based solely on evidence that the drivers could have been assigned to drive out-of-state. See Vidinliev v. Carey Int'l, Inc., 581 F. Supp. 2d 1281, 1287 (N.D. Ga. 2008).

There remains one possible additional requirement for a worker to qualify as an "employee" for the purposes of § 31502: that the worker's duties involve work on a "commercial motor vehicle," as that term is defined in 49 U.S.C. § 31132(a). In many cases, an employer will operate both commercial motor vehicles and non-commercial motor vehicles—it will field a so-called "mixed fleet." Its use of the former to provide transportation for pay will render it a motor carrier for the purposes of § 31502, but it is possible that some of its safety-affecting workers never work on commercial vehicles. This could be the case where, for example, an employer has two divisions—one operating commercial motor vehicles and one operating non-commercial motor vehicles—each with a separate workforce. The question is: whether workers whose employer is undoubtably a motor carrier because of its operation of commercial motor vehicles must be personally involved with the operation of such vehicles to qualify as "employees" under § 31502.

This is a relatively new and limited issue because, prior to 2005, the term "motor carrier" was not defined by reference to commercial motor vehicles, see 49 U.S.C. § 13102(12) (2000), and, as discussed, after 2008, the reference was again dropped (see supra note 9). But, for the

14

time period relevant to this case, motor carriers were defined in part by their use of commercial motor vehicles, and so the court must determine whether a worker's status as an "employee" also turned the use of such vehicles.

The courts have split on the issue, but the majority of those that have considered it favor requiring at least some nexus between an individual worker's duties and the use of commercial motor vehicles. See, e.g., Avery v. Chariots For Hire, 748 F. Supp. 2d 492, 499-501 (D. Md. 2010); Daulton v. Sabo, No. 09-CV-358 (AA), 2010 WL 1325613, at *3 (D. Or. Apr. 1, 2010); Brooks v. Halsted Commc'ns, 620 F. Supp. 2d 193, 202 (D. Mass. 2009); Hernandez v. Brink's, Inc., No. 08-CV-20717, 2009 WL 113406, at *5 (S.D. Fla. Jan. 15, 2009); Vidinliev, 581 F. Supp. 2d. at 1292. But see Tidd v. Adecco USA, Inc., No. 07-CV-11214 (GAO), 2008 WL 4286512, (D. Mass. Sept. 17, 2008) (holding that individual workers may still be "employees" regardless of whether they have any connection to commercial motor vehicles).

It makes sense to follow the majority rule. For one thing, a contrary position would potentially allow employers to have bought a single commercial motor vehicle for the sole purpose of triggering the motor carrier exemption. See Brooks, 620 F. Supp. 2d at 202-03; Vidliniev, 581 F. Supp. 2d. at 1294. Another reason is that requiring a worker-by-worker nexus is consistent with Supreme Court case law requiring that motor carriers demonstrate each worker's relationship to interstate transportation before availing themselves of the exemption. See Morris, 332 U.S. at 423-441 (inquiring into individual truck drivers' connection to interstate transportation notwithstanding the fact that their employer was clearly involved in interstate transportation).

Accordingly, the court holds that, during the time that Fox drove for Commonwealth, a

15

motor-carrier worker was not an "employee" for the purposes of § 31502 unless that worker's duties were related to the operation of a commercial vehicle, as that term is defined in 49 U.S.C. § 31132(a). The court holds that, as with the requirements that workers' duties affect safety and interstate transportation, it is the character of a worker's commercial-vehicle-related activities, not the quantity of them, that is dispositive. There is no minimum amount of time a motor carrier worker needs to spend working on commercial motor vehicles; it is sufficient that a worker "is likely to be called on" to work on a commercial vehicle.

In sum, for the purposes of § 31502 in 2007 and early 2008, an "employee" was a worker whose duties directly affected the safety of operation of commercial vehicles used in interstate transportation. If some aspect of the worker's duties affected safety in a non-de-minimus way and it was likely that the worker would be called upon to perform these duties on a commercial vehicle involved in interstate transportation, then that worker was an employee.

After reviewing the record, the court concludes that a reasonable juror would be compelled to find all of the facts needed to establish the Secretary of Transportation's power to set Fox's maximum service hours. Indeed, almost all of these material facts are undisputed.

The evidence shows that Commonwealth was a motor carrier for the purposes of § 31502. It is undisputed that Commonwealth used eight-plus-passenger SUVs and vans to take passengers to and from destinations inside and outside the State of New York.[13]  The passengers

---

[13] The majority of Fox's brief on this issue is devoted to disputing Commonwealth's use of commercial motor vehicles. (See Mem. of Law in Opp'n to Defs. Mot. for Summ. J. (Docket Entry # 78) at 6-7.) He argues that "[n]owhere in their moving papers do Defendants contend that their vehicles weigh 10,001 pounds or more." (Id. at 6.). This is true, but Fox ignores entirely that fact that vehicles "designed to or used to transport more than 8 passengers (including the driver) for compensation," 49 U.S.C.A. § 31132(1)(B) (West 2007), are also commercial motor vehicles for the purposes of § 315102.

16

paid for this service. Commonwealth thus provided commercial motor vehicle transportation for compensation, and was a "motor carrier" as that term is defined in 49 U.S.C § 13202(14).

Fox's status as an "employee" is equally clear. As a full-time chauffeur who drove eight-plus-passenger SUVs and vans, there is no question that Fox's duties directly affected the safety and operation of commercial motor vehicles. And his trips with passengers across state lines easily satisfies requirement of interstate transportation.[14]

Because Fox was an "employee . . . of a motor carrier," the Secretary of Transportation had the power under 49 U.S.C. § 31502 to set his maximum service hours. He was therefore exempt from the FLSA's overtime protections, and summary judgment is accordingly granted for Commonwealth on its defense that the motor carrier exemption precludes liability on Fox's FLSA claim.[15]

Commonwealth is also entitled to summary judgment on its defense that the motor carrier

---

[14] To the extent Fox could contend that there is no evidence that he drove commercial motor vehicles in interstate transportation—that the record does not preclude the possibility that he only drove commercial motor vehicles in-state—such an argument is foreclosed by the indisputable fact that he could have been assigned to take such vehicles across state lines at any time. As the court has held, the Secretary of Transportation's power to set employees' maximum service hours does not turn on motor-carrier workers' actual historical performance, but rather on whether such workers are "likely to be called upon" to perform safety-affecting duties on commercial motor vehicles in interstate transportation. The court concludes that, on this record, no reasonable juror could find that it was unlikely for Fox to be called upon to perform such duties. Unrebutted affidavit testimony shows that Commonwealth's chauffeurs could be called upon to drive any vehicle in the company's fleet, and that chauffeurs frequently transported passengers to and from other states. (See 2nd Rutter Aff. (Docket # 86, Ex. 16) ¶ 7.) The only reasonable inference to draw from this evidence is that it would only be a matter of time before Commonwealth assigned a chauffeur in Fox's position to drive a commercial motor vehicle across state lines.

[15] Because the court grants summary judgment for Commonwealth on its motor carrier exemption defense, it need not consider Commonwealth's alternative defense based on the "taxicab exemption," 29 U.S.C.A. § 213(b)(17) (West 1998).

17

exemption precludes liability under New York's Labor Law. The New York State Department of Labor takes the position that the overtime provisions contained in that law expressly incorporate the FLSA's exemptions, see 12 N.Y.C.R.R. § 142-2.2. Federal courts have followed the Department's guidance, applying FLSA exemptions to state Labor Law claims. See, e.g., Torres v. Gristede's Operating Corp., 627 F. Supp. 2d 447, 456 n.4 (S.D.N.Y. 2008). This includes the motor carrier exemption. See Khan v. IBI Armored Servs., 474 F. Supp. 2d 448, 450 & n.1 (E.D.N.Y. 2007). Because Fox was subject to the FLSA's motor carrier exemption, he is also exempt from the Labor Law's overtime protections.

The court next addresses Commonwealth's argument that Fox's has failed to raise triable issue of fact about one or more elements of his FCRA and NYHRL claims. With respect to the FCRA claim, Commonwealth contends that there is no evidence in the record from which a reasonable juror could find that it acted with the required mental state. As for the NYHRL claim, it argues, among other things, that Fox could not have suffered employment discrimination because he was never subjected to an adverse employment action.

The relevant provision of the FCRA states:

> [I]n using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to whom the report relates—
>> (i) a copy of the report; and
>> (ii) a description in writing of the rights of the consumer under this title . . ..

15 U.S.C. § 1681b(b)(3)(A). An employer's failure to comply with this provision, however, is not by itself enough to trigger civil liability to a private plaintiff. Instead, to recover for a violation of the statute, a plaintiff must show either: (1) that the failure was willful, id. § 1681n;

18

or (2) that the failure was a result of negligence and that the plaintiff sustained actual damages, id. at § 1681o. See also Thibodeaux v. Rupers, 196 F. Supp. 2d 585, 591 (S.D. Ohio) (holding that § 1681b is not strict liability statute).

The court does not need to determine whether Commonwealth complied with § 1681b(b)(3) because Fox has not pointed to any evidence in the record indicating that any failure to comply—if one occurred—was willful or negligent. Indeed, the complaint fails to even allege these elements in a non-conclusory fashion. (Cf. 2d Am. Compl. ¶ 79 ("Defendants have violated the Fair Credit Reporting Act willfully").) Fox's FCRA claim accordingly fails as a matter of law, and Commonwealth is entitled to summary judgment.[16]

In relevant part, the Human Rights Law makes it "an unlawful discriminatory practice for any . . . corporation . . . to deny . . . employment to any individual by reason of his or her having been convicted of one or more criminal offenses . . . when such denial is in violation of article twenty-three-A of the correction law." N.Y. Exec. Law § 296(15) (McKinney's 2010). Article 23A of the Correction Law, in turn, states in relevant part that:

> [n]o application for . . . employment . . . shall be denied by reason of the applicant's having been previously convicted of one or more criminal offenses . . . unless:
>> (1) there is a direct relationship between one or more of the previous criminal offenses and the specific . . . employment sought; or
>> (2) the . . . granting of employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

N.Y. Correct. Law § 752 (McKinney's 2010). Any person "aggrieved by an unlawful discriminatory practice" may sue in a court of competent jurisdiction. N.Y. Exec. Law § 297(9)

---

[16] The court also notes that there is no evidence that Fox suffered any actual damages as a result of any FCRA violation.

(McKinney's 2010).

The parties disagree about the elements of a claim for employment discrimination based on the Correction Law. Commonwealth argues that, because the text of the law itself refers only to the "deni[al]" of "employment," a plaintiff in Fox's position must establish that he was fired to recover under the Human Rights Law. Fox maintains that he needs to only demonstrate an "adverse employment action"—arguably something short of outright termination.

The court need not decide the issue. Fox is correct that several federal courts have construed employment discrimination claims arising under various provisions of the Human Rights Law as akin to those arising under federal civil rights laws, and accordingly extended the Human Rights Law's reach to "adverse employment actions." See, e.g, James v. N.Y. Racing Ass'n, 233 F.3d 149, 151, 153-54 (2d Cir. 2000) (addressing NYHRL and federal Age Discrimination in Employment Act claims together under the same framework); Obabueki v. IBM, 245 F. Supp. 371, 380 (S.D.N.Y. 2001) (applying James framework to NYHRL claim based on the Correction Law). That such an interpretation seems at odds with the plain language of the Correction Law is an issue for the courts of the State of New York. It is not dispositive here because the undisputed facts of this case fail to establish that Fox suffered any "adverse employment action," let alone was fired.

The Second Circuit has defined an adverse employment action as follows:

A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a

particular situation.

Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (citations and internal quotation marks omitted). Importantly, there is a temporal aspect to determining whether an employment action constitutes "a materially adverse change in the terms and conditions of employment." Short-term suspensions pending investigations into wrongdoing generally do not, without more, work an materially adverse change to the terms and conditions of employment. See id. at 91, 92; see also id. at 90-91 (citing Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 889, 892 (8th Cir. 2005); Peltier v. United States, 388 F.3d 984, 988 (6th Cir. 2004); Von Gunten v. Maryland, 243 F.3d 858, 869 (4th Cir. 2001); Breaux v. City of Garland, 205 F.3d 150, 154-55, 158 (5th Cir. 2000)). This is because the terms and conditions of employment usually account for disciplinary action "in appropriate circumstances." Id. at 91 (citing Von Gunten, 243 F.3d at 869).

Obviously, repeated suspensions or "[a]n exceptionally dilatory investigation" could constitute adverse employment action, see id. at 92, but that is not what occurred here. Instead, the record shows that Fox's suspension was not more than four-days old before he—not Commonwealth—ended the employment relationship. Immediately after Commonwealth informed Fox that he was suspended pending his communication with the human resources department, Fox left work and, four days later, sent a letter to the human resources department accusing Commonwealth of firing him. Although Commonwealth did not concede the point—responding that Fox had merely been "pulled off the road"—Fox never returned to work or otherwise sought reinstatement.

The suspension was not only short, it was also justified by the need to investigate Fox's past convictions. By allowing for termination where an employer finds that its employee's prior

conviction impacts safety, the Correction Law anticipates that employers will investigate the circumstances surrounding employee convictions when the convictions are discovered. The court declines to read into the Correction Law a requirement that employers keep previously-convicted employees on the job while they conduct a statutorily-permitted investigation into their prior conviction. It was thus entirely reasonable for Commonwealth to suspend Fox for a short time while it looked into his convictions.

As with the employment situations discussed in the cases cited above, the terms and conditions of Fox's job at Commonwealth included the possibility of a temporary suspension if Commonwealth discovered a prior conviction. As such, Fox was not subject to an adverse employment action, and his Human Rights Law claim fails even under his preferred construction. Commonwealth is entitled to summary judgment.

### Motion for Conditional Certification of a Collective Action

Because summary judgment is granted for Commonwealth on its defense to Fox's FLSA claim, Fox's motion to conditionally certify a collective action under that statute is denied.

**III    CONCLUSION**

For the foregoing reasons, Commonwealth's motion for summary judgment is GRANTED in its entirety, Fox's motion to certify a collective action under the FLSA is DENIED. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: Brooklyn, New York
    March 30, 2012

s/Nicholas G. Garaufis

_____
NICHOLAS G. GARAUFIS
United States District Judge

22